UNITED STATES of America ex rel. Michael LISSACK, Plaintiff–Appellant,

v.

SAKURA GLOBAL CAPITAL MARKETS, INC. and Mitsui Taiyo Kobe Global Capital, Inc., Defendants–Appellees.

Docket No. 03–7977.

United States Court of Appeals, Second Circuit.

Argued: May 14, 2004.

Decided: Aug. 3, 2004.

*Id.*, 94 P.3d at 642, 2004 WL 1613774, at *19, 2004 Colo. LEXIS 557, at *60–*61 (Bender, J.

William B. Pollard, III, Kornstein, Veisz, Wexler & Pollard, LLP, New York, New York (John R. Phillips, Erika Kelton, Phillips & Cohen, LLP, Washington, D.C., Marc Marmaro, Jeffer, Mangels, Butler & Marmaro, LLP, Los Angeles, California, on the brief) for Appellant.

John K. Carroll, (James D. Miller, Christopher Joralemon on the brief) Clifford Chance U.S. LLP, New York, New York, for Appellees.

Before: FEINBERG and CABRANES, Circuit Judges, and KRAVITZ, District Judge.*

KRAVITZ, District Judge.

The relator in this case, Michael Lissack ("Lissack"), acting on behalf of the U.S. Government, sued the defendants ("Sakura") under the False Claims Act for damages arising from alleged false statements and claims made by Sakura in connection with a "yield burning" scheme involving tax-free municipal bonds. The False Claims Act authorizes private citizens to sue on behalf of the United States to recover treble damages from those who knowingly make false claims for money or property upon the Government or who knowingly submit false statements in support of such claims or to avoid the payment of money or property to the Government. *See* 31 U.S.C. § 3729 *et seq.* However, the False Claims Act contains a proviso known as the "Tax Bar," which excludes from the Act's coverage all "claims, records, or statements made under the Internal Revenue Code of 1986." *See* 31 U.S.C. § 3729(e).

In a decision of first impression, the United States District Court for the Southern District of New York (Barbara S. Jones, *Judge*) held that even though Lissack did not seek to recover federal taxes, his claims nonetheless fell within the purview of the Tax Bar because the falsity of the claims at issue depended entirely upon proving violations of the Internal Revenue Code. We agree with Judge Jones's thoughtful and comprehensive treatment of the issues and affirm on the ground that the Tax Bar excludes Lissack's claims from recovery under the False Claims Act. Accordingly, we do not reach the other

dissenting) (citation and internal quotation marks omitted).

* The Honorable Mark R. Kravitz of the United States District Court for the District of Connecticut, sitting by designation.

grounds relied on by the District Court for dismissing Lissack's claims.[1]

## I.

### A.  Background

This case presents a highly complex financial scheme involving tax-exempt state and local government ("municipal") bonds, and, more specifically, bonds known as advance refunding bonds. The description we provide of this scheme, which lies at the intersection between finance and tax law, relies heavily on Judge Jones's thorough opinion below, as well as on Lissack's Second Amended Complaint.

The Internal Revenue Code (the "Tax Code") allows municipal governments to issue bonds that pay interest which is exempt from federal taxation. *See* 26 U.S.C. § 103(a). When interest rates decline, as they did in the early 1990s, municipal governments often seek to refinance their tax-exempt municipal debt before it otherwise would become due by issuing what are known as advance refunding bonds. Typically, advance refunding bonds also qualify as tax exempt. They provide municipalities with funds, at lower interest rates, that are used to pay off the principal and interest due on previously issued tax-exempt bonds carrying higher interest rates.

Because the underlying debt on the original bonds cannot be retired until the call date of those bonds, municipalities must invest the proceeds from issuance of the advance refunding bonds so as to generate cash flows to meet the debt service requirements of the original bonds. The Tax Code tightly regulates the use and investment of proceeds from issuance of tax-

exempt advance refunding bonds. Treasury Department regulations require municipalities to place all proceeds from the sale of advance refunding bonds in an irrevocable "defeasance escrow" account ("escrow account"), which can be used only to pay principal and interest on the previously issued bonds until the original bonds can be retired. 26 C.F.R. § 1.141–12(d)(5) (defining defeasance escrow as "an irrevocable escrow established to redeem bonds on their earliest call date in an amount that, together with investment earnings, is sufficient to pay all the principal of, and interest and call premium on, bonds from the date the escrow is established to the earliest call date").

The Tax Code strictly limits the yields that municipalities can earn on their escrow accounts so as to prevent municipalities from engaging in what is known as "arbitrage"—that is, investing the proceeds of the tax-exempt advance refunding bonds in higher-yielding taxable securities and thereby profiting from the tax-exempt status of the bonds. As the Treasury Department's regulations explain:

> Under section 103(a), interest on certain obligations issued by States and local governments is excludable from the gross income of the owners. Section 148 was enacted to minimize the arbitrage benefits from investing gross proceeds of tax-exempt bonds in higher yielding investments and to remove the arbitrage incentives· to issue more bonds, to issue bonds earlier, or to leave bonds outstanding longer than is otherwise reasonably necessary to accomplish the governmental purposes for which the bonds were issued. To accomplish

---

1.  The District Court found in the alternative that a number of claims at issue were barred by the "Public Disclosure Bar" of the False Claims Act, 31 U.S.C. § 3730(e)(4)(A), and ordered the remaining claims dismissed for failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). We express no view on either of these rulings.

these purposes, section 148 restricts the direct and indirect investment of bond proceeds in higher yielding investments and requires that certain earnings on higher yielding investments be rebated to the United States. Violation of these provisions causes the bonds in the issue to become arbitrage bonds, the interest on which is not excludable from the gross income of the owners under section 103(a).

26 C.F.R. § 1.148–0.

Under the Tax Code, if the yield on the escrow account is greater than the yield earned by the holders of the advanced refunding bonds, the bonds are considered "arbitrage" bonds and are no longer tax exempt. 26 U.S.C. § 103(b)(2) (excluding arbitrage bonds from tax exemption provision). "[T]he term 'arbitrage bond' means any bond issued as part of an issue any portion of the proceeds of which are reasonably expected (at the time of issuance of the bond) to be used directly or indirectly(1) to acquire higher yielding investments, or (2) to replace funds which were used directly or indirectly to acquire higher yielding investments." *Id.* § 148(a). "Positive arbitrage" refers to situations where the combined yield on the escrow account is higher than the yield on the bonds, with the amount of positive arbitrage defined as the difference between the two yields.

Typically, escrow accounts consist of U.S. Treasury securities that are scheduled to mature on a date as close as possible to the date on which a debt service payment is due on the original bonds. Often, however, it is impossible to arrange the timing of payments on the Treasury securities in the escrow account to coincide exactly with the due dates of payments on the originally issued municipal bonds. This results in a gap period, known as the "float period," which can extend for several days or even a month or more. To keep the escrow account fully invested even during float periods, municipalities bridge the float periods through a financial product known as a "forward supply agreement." Forward supply agreements are contracts that give their purchasers the right to invest the cash flows generated by the escrow account in short-term securities at specified future dates. These agreements are arranged at the time the escrow account is established, since the dates and duration of the float periods can be determined at that point. What cannot be determined at that point, however, are the specific reinvestments contemplated by the forward supply agreement, because they will occur in the future. As a consequence, providers of forward supply agreements (the "provider") structure them so that they pay municipalities a sum certain for the right to reinvest future escrow cash flows during float periods. Through these agreements, municipalities derive the funds they will need to bridge the float periods; in return, the provider of the forward supply agreement receives the right to retain the proceeds derived from reinvesting the cash flows in the escrow account at specified future dates. A market exists for these forward supply agreements, which are commonly used in both public and private transactions that involve timing gaps in portfolios.

Because the price of the forward supply agreement is determined by assessing the return the provider expects to earn from reinvesting cash flows in the escrow account during float periods, a forward supply agreement provider can exaggerate its investment costs in order to understate its expected return and thereby pay less to the municipality for the opportunity to invest the escrow account's cash flows. In order to prevent this fraud, the Internal Revenue Service ("IRS") has established a

bidding process to ensure fair market values for forward supply agreements. 26 C.F.R. § 1.148–5(d)(6)(iii).

Due to the restrictions against arbitrage discussed previously, municipalities must ensure that the combined yield on both the securities held in the escrow account and the amounts earned from the forward supply agreements do not exceed the yields paid to holders of the advance refunding bonds. Because the amount realized from the sale of the forward supply agreements must be included when calculating the yield generated by the escrow account, the more a provider of a forward supply agreement pays the municipal issuer, the higher the yield of the escrow account, and vice-versa. If a municipality determines that the combined yield of the securities held in the escrow account and forward supply agreement would exceed the yield paid the bondholders, the municipality can reduce the total yield to the proper level—and thereby avoid arbitrage and the loss of tax-exempt status for its advance refunding bonds—by purchasing U.S. Treasury State and Local Government Series ("SLGS") bonds, which are securities available only to state and local governments. SLGS bonds are offered in an array of interest rates, including zero-interest.[2]

Through the amount of zero-interest SLGS bonds it purchases, a municipality can effectively calibrate the total yield on its escrow account to avoid arbitrage.[3] The federal government benefits as well, as it is able to enjoy the benefits of zero-interest borrowing on any zero-interest SLGS bonds sold to municipalities.

## B. The Alleged Yield Burning Scheme In This Case

In the present case, the alleged fraud arises from Sakura's sale of forward supply agreements to municipal bond issuers. Lissack claims that Sakura fraudulently mispriced forward supply agreements by rigging the bidding process for the agreements. According to Lissack, Sakura arranged for noncompetitive bidders to make bids well below market value, thus ensuring that Sakura's similarly below-market-value bid would be selected by the municipalities. The Second Amended Complaint alleges the following conduct:

> Sakura and its co-conspirators also corrupted, and conspired to corrupt, the bid selection process by, inter alia, selecting non-competitive bidders to participate in the bid process; communicating "not to exceed" bid amounts to "losing" bidders; selecting fewer than three disinterested bidders to participate in the bid process;

2. Treasury Regulations provide that "The Secretary of the Treasury (the Secretary) offers for sale State and Local Government Series (SLGS) securities to provide issuers of tax exempt securities with investments from any amounts that: (1) Constitute gross proceeds of an issue; or (2) Assist in complying with applicable provisions of the Internal Revenue Code relating to the tax exemption." 31 C.F.R. § 344.0(a).

3. "The flexibility of the SLGS securities program provides issuers with an opportunity to structure their advance refunding escrows to achieve maximum efficiency while ensuring that investments acquired with bond proceeds do not earn a materially higher yield. In other words, SLGS can be used to ensure that the advance refunding bonds do not run afoul of the yield restriction rules of section 148 and, consequently, result in being declared arbitrage bonds. This can be accomplished either through fully funding the refunding escrow with SLGS earning yields at a level permissible under the yield restriction rules or through blending down the escrow's yield by rolling open market securities into zero interest SLGS." Peter J. Mazarakos & Steven A. Chamberlin, The SLGS Compliance Initiative: A Corresponding Examination Initiative of Advance Refunding Bonds 143 (available at http://www.irs.gov/pub/irs-tege/teb3b03.pdf) (last visited July 28, 2004: copy docketed with Court of Appeals).

providing false or misleading information in order to cause legitimate bidders to submit artificially low bids; diverting portions of anticipated profits to pay off co-conspirators that solicited non-competitive bids or otherwise ensured Sakura's selection as forward supply provider.

Lissack claims that Sakura concealed the sham bidding process from the involved municipalities and made false statements and misrepresentations in writing that the transactions complied with federal law and that the forward supply agreements would not cause the advance refunding bonds to run afoul of the IRS's arbitrage restrictions. Sakura's representations allegedly induced municipal issuers and bond counsel to issue certifications that their bonds complied with the yield restrictions of federal law and thus qualified for tax-exempt status.[4]

Sakura's alleged fraud decreased the price paid to the municipal bond issuers for forward supply agreements below market value and consequently reduced the ultimate yields of the municipalities' escrow accounts below what the yields would have been in the absence of Sakura's fraud, a phenomenon known as "yield burning," so named because the yield on the escrow account is artificially lowered (and thus "burned") through the mispricing of the forward supply agreement. Yield burning creates a significant profit for the forward supply agreement provider since it allows the provider to pay less for the right to reinvest the escrow account cash flows during the float periods than the provider can expect to earn on reinvestment of those cash flows. Yield burning also causes the municipal bond issuers effectively (and unknowingly) to engage in bond arbitrage, thereby jeopardizing the tax-free status of their advance refunding bonds. The arbitrage arises from the fact that if the forward supply agreement were correctly priced, the total yield derived from the municipality's escrow account would be greater than the yield paid to bondholders.[5]

The events alleged in the complaint are connected to an investigation launched in

---

**4.** As the Second Amended Complaint states:

48. Among the documents required for closing, legal counsel for the transaction (usually 'bond counsel' or 'special tax counsel') had to render an opinion that the advance refunding bonds were not arbitrage bonds. Legal counsel's opinion was based on, inter alia, the issuer's certifications that the yield on the escrow was not more than the yield on the advance refunding bonds, and that the advance refunding bonds were not, and would not become, arbitrage bonds.

49. Both legal counsel's opinion and the issuer's certification were based in part on the forward supply provider's representation, be it express or implied, that the forward supply agreement was priced at fair market value and/or that the yield on the agreement was not less than that available from the forward supply provider on reasonably comparable agreements purchased in connection with non-tax exempt transactions.

**5.** An example might help illustrate the point. If a municipality has $100 million of bonds outstanding at a 5% interest rate, the escrow account must yield $5 million in order to cover its interest obligations. Assuming that the market price of the forward supply agreement on such an escrow account would be $500,000, the municipality would calibrate the securities purchased in the escrow account to yield a total of $4.5 million. However, if the forward supply agreement provider improperly engages in yield burning by asserting that the fair market value of the agreement is only $400,000 and paying that sum to the issuer, the municipality would arrange the escrow account (by purchasing more Treasury securities and fewer zero-interest SLGS bonds) so as to realize a yield of $4.6 million in order to ensure that the escrow account's yield equaled the payment obligations on the bonds. The municipality thus exceeds the limits on arbitrage by $100,000, which is the amount the provider of the forward supply agreement pockets as a result of the fraud.

late 1993 by the Department of Justice ("DOJ"), the Securities and Exchange Commission ("SEC"), and the IRS examining the practice of yield burning in the municipal bonds industry. This investigation focused on whether IRS fair market pricing rules were violated during transactions involving advance refunding bonds. Lissack filed his original complaint in this action in February of 1995, in which he named multiple defendants, all of whom were municipal bond issuers or securities dealers, but did not include Sakura. The Government elected to intervene in that action, which related to the existing investigation, and reached settlement agreements with twenty-seven financial institutions in which the institutions paid the Government approximately $200 million in penalties and disgorgement.

In May 1996, Lissack filed an amended complaint, in which he included allegations against Sakura based on ten allegedly fraudulent forward supply agreements. In the complaint, Lissack asserts that Sakura's yield-burning scheme resulted in two distinct, though related, harms to the Government. According to Lissack, had Sakura correctly priced the forward supply agreements, municipalities would have purchased fewer interest-bearing Treasury securities and more zero-interest SLGS bonds in their escrow accounts so as to calibrate the total escrow yield to match the yield payable to the bondholders and to ensure the tax-exempt status of the bonds. Because municipal bond issuers purchased fewer zero-interest SLGS bonds than they otherwise would have purchased, Lissack asserts that the Government was deprived of the benefit of no-cost borrowing on the zero-interest SLGS bonds not purchased. Correspondingly, because municipalities unwittingly purchased more interest-bearing Treasury securities for their escrow accounts than they were entitled to purchase, Lissack claims that the Government paid out more in interest on Treasury securities than the Government would have paid had Sakura properly priced the forward supply agreements. These alleged harms are identical in amount; the value of the "excess" interest the Government paid on escrowed interest-bearing Treasury securities is identical to value of no-cost borrowing the Government was denied. Importantly for the present case, these alleged harms are also equal to the amount of the positive arbitrage—that is, the amount by which the yield on the municipality's escrow account (if properly priced) exceeded the yield paid on their tax-exempt advance refunding bonds.

The Government declined to intervene in the case against Sakura. In March 2001, Lissack filed a second amended complaint, listing five additional allegedly fraudulent forward supply agreements provided by Sakura. On August 19, 2003, the District Court granted Sakura's motion to dismiss, concluding, as is relevant here, that Lissack's case "is barred by the clear language of the FCA's Tax Bar." This appeal followed.

## II.

■ We review District Court determinations on motions to dismiss de novo. *See, e.g. Muntaqim v. Coombe,* 366 F.3d 102, 106 (2d Cir.2004). "In this case, 'because the district court's disposition presents only a legal issue of statutory interpretation .... we review de novo whether the district court correctly interpreted the statute.'" *Id.* (quoting *Perry v. Dowling,* 95 F.3d 231, 235 (2d Cir.1996)).

Congress enacted the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq,* in 1863 "with the principal goal of stopping the massive frauds perpetrated by large [private] contractors during the Civil War.'" *Vermont Agency of Natural Res. v. United*

*States ex rel. Stevens,* 529 U.S. 765, 781, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (quoting *United States v. Bornstein,* 423 U.S. 303, 309, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976)). While the Government can bring an action under the FCA, 31 U.S.C. § 3730(a), the act also provides for a private individual to pursue an action on a *qui tam* basis "in the name of the Government." 31 U.S.C. § 3730(b)(1); *see also Vermont Agency of Natural Res.,* 529 U.S. at 768, 120 S.Ct. 1858. Under the FCA, the United States, or private citizens acting on its behalf, may sue to recover monies paid to a person who, among other things: "(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; ... or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729.[6]

The FCA subjects defendants to liability for up to treble damages and a civil penalty of up to $10,000 per claim. 31 U.S.C. § 3729(a). "The relator's share of the 'proceeds of the action or settlement' may be up to 30 percent, depending on whether the Government intervened and, if so, how much the relator contributed to the prosecution of the claim." *Cook County v. United States ex rel. Chandler,* 538 U.S. 119, 123, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) (quoting 31 U.S.C. § 3730(d)).[7]

The FCA contains a provision known as the "Tax Bar" which states that the act "does not apply to claims, records, or statements made under the Internal Revenue Code of 1986." 31 U.S.C. § 3729(e). The Tax Bar was added to the FCA in 1986, along with the "reverse false claims" provision, § 3729(a)(7), which creates FCA liability for false statements designed to conceal, reduce, or avoid an obligation to pay money or property to the Government. *See* False Claims Amendments Act of 1986, Pub.L. No. 99-562, § 2, 100 Stat. 3153, 3153-54. The legislative history of the Tax Bar is sparse and not useful in determining its precise contours, limited as the legislative history is to a lone statement in the Senate Report that "it is now apparent that the False Claims Act does not apply to income tax cases, and the Committee does not intend that it should be so used." S.Rep. No. 99-345, at 18, reprinted at 1986 U.S.C.C.A.N. 5266, 5283 (1986).

Since its addition to the FCA, the Tax Bar has not been construed often by the courts. Those courts that have considered the Tax Bar have concluded that it was intended to codify case law existing before

6. Though it is unclear whether the purchase of securities issued by the Government falls under the False Claims Act at all, we will not address that question here. For the purposes of this case, we will assume (without deciding) that the False Claims Act would encompass Lissack's claims absent the Tax Bar.

7. If the Government does not intervene, as is the case here, "the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant." 31 U.S.C. § 3730(d)(2).

the 1986 amendment, which reserved discretion to prosecute tax violations to the IRS and barred FCA actions based on tax violations. *United States ex rel. Lissack v. Sakura Global Capital Mkts.*, No. 95civ1363(BSJ), 2003 U.S. Dist. LEXIS 14600, at *18 (S.D.N.Y. Aug. 21, 2003) ("Congress codified existing case law that had held that the FCA did not support actions based on alleged violations of federal tax law."); *see, e.g., United States ex rel. U.S.-Namibia Trade & Cultural Council v. Africa Fund*, 588 F.Supp. 1350, 1351 (S.D.N.Y.1984) ("In essence, plaintiff is attempting to enforce the tax laws through an improper vehicle—the False Claims Act."). The conclusion that the IRS has exclusive jurisdiction over tax matters stems in part from § 7401 of the Tax Code, which provides: "No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action be commenced." 26 U.S.C. § 7401.

Having set forth the facts of the case and the statutory background, the question presented is fairly straightforward: does the Tax Bar apply in a case like this, where the relator does not, strictly speaking, seek to recover federal taxes, but where the falsity of the underlying claim depends upon a violation of the Tax Code?

### III.

Lissack identifies the false claim for which he seeks to recover on behalf of the Government as the wrongful purchase of interest-bearing federal securities in lieu of zero-interest SLGS bonds, thus causing the government to pay out more in interest than it should have and depriving the government of the benefit of zero-interest borrowing. He asserts that this claim is not a claim made under the Tax Code because he is only seeking to collect amounts the Government supposedly lost through the municipalities' bond purchases and is not seeking to recover taxes that citizens have avoided by not paying taxes on bonds that violate the arbitrage rules and thus are not tax exempt. Lissack urges us to hold that only claims involving the collection of a tax liability implicate the Tax Bar.

■ It is true that the only reported cases applying the Tax Bar to bar FCA claims did indeed involve income tax claims. *See, e.g., Almeida v. United Steelworkers of Am. Int'l Union*, 50 F.Supp.2d 115, 126–27 (D.R.I.1999); *Hardin v. DuPont Scandinavia*, 731 F.Supp. 1202, 1204 (S.D.N.Y.1990). However, nothing in those decisions suggests that the Tax Bar should prohibit only actions that, on their face, seek to recover taxes. Though, as he has characterized his claim in the complaint, Lissack does not seek to collect taxes, we conclude that the claims he asserts nonetheless fall squarely within the language and evident intent of the Tax Bar. We do so for two reasons. First, the very basis for Lissack's case depends entirely on a purported violation of the Tax Code—that is, Sakura's claims are false claims insofar as the Government is concerned precisely because (and only because) they violate the Tax Code. Second, as Lissack's counsel acknowledged at oral argument, the IRS has authority to recover the precise amounts Lissack is seeking in this action. Because of our conclusion that this case falls within the heartland of the Tax Bar, we have no occasion to set forth the outer boundaries of that provision.

It is clear that Lissack's entire case under the FCA depends on proving that Sakura violated provisions of the Tax Code. It is the Tax Code that provides for

the tax-exempt status of municipal bonds, including the advance refunding bonds involved in this case; it is the Tax Code that excludes from tax-exempt status any bond classified as an arbitrage bond; and it is the Tax Code that provides detailed yield restrictions for escrow accounts and defines what constitutes an arbitrage bond. 26 U.S.C. § 103(a); 26 U.S.C. § 148(a); 26 U.S.C. § 103(b)(2). Additionally, Treasury Regulations established under the Tax Code establish the rules for bidding on the forward supply agreements that Sakura is alleged to have violated, and those regulations determine the falsity of the certifications that Sakura caused issuers and bond counsel to make regarding the tax-exempt status of the bonds. *See* 26 C.F.R. § 1.148–5(d)(6)(iii); 26 C.F.R. § 1.148–2. Indeed, the very existence of SLGS bonds arises from municipalities' need to comply with the Tax Code.[8] It is apparent, therefore, that all of these regulations and indeed the entire tax-exempt bond system are governed by provisions of the Tax Code and are closely regulated by the Treasury Department.

In fact, at oral argument, Lissack acknowledged that in the absence of a violation of the Tax Code, he cannot prevail, as there would be no "false" claim insofar as the FCA is concerned. Put another way, the mere ordering of the SLGS bonds and Treasury securities was not the fraud here; the fraud was the failure to conform to IRS rules for maintaining tax-exempt status of advance refunding bonds. The municipalities' purchase of SLGS bonds and Treasury securities thus "harmed" the Government only because the Tax Code's anti-arbitrage rules required that the municipalities purchase different amounts of those securities than they actually did. It would be counterintuitive to conclude that the case does not involve "claims, records, or statements made under the Internal Revenue Code of 1986" when the entire case will depend on an examination of financial records and allegedly false statements to determine whether the claims for federal securities relying on those records and statements are proper under the Tax Code. Because Lissack's FCA claim rises or falls on finding a violation of the Tax Code, his is precisely the kind of claim that falls within the plain language of the Tax Bar.

We thus reject Lissack's rigid distinction between (a) the (false) claims made by the municipalities when they unwittingly registered to purchase too many interest-bearing Treasuries and too few zero-interest SLGS securities, claims which Lissack argues do not implicate the Tax Bar; and (b) any attempt by the municipalities to maintain the bonds' tax-exempt status despite the failure to comply with the arbitrage provisions due to Sakura's fraud.[9] This is

---

8. "The Tax Reform Act of 1986 imposed arbitrage rebate requirements on issuers of tax-exempt bonds and directed the Department of the Treasury to modify its State and Local Government Series (SLGS) program to accommodate the new requirements and enable entities to invest qualifying funds in a Treasury money-market type investment vehicle. Accordingly, the Department expanded the program with its 1986 regulations to include a new "demand deposit" security offering for investing proceeds from tax-exempt bond issues. This security is not treated as investment property for purposes of sections 143(g)(3) and 148 of the Internal Revenue Code and,

therefore, enables eligible entities to invest proceeds of tax-exempt bonds in an obligation which avoids the earning of rebatable arbitrage." 54 Fed.Reg. 28, 752 (July 7, 1989).

9. Lissack also seeks to distinguish between false claims, which he acknowledges are covered by the FCA, and false statements underlying such claims, which he argues are not. His argument is essentially that the falsity of the statements and certifications Sakura made with regard to the arbitrage status of the bonds, which implicate the Tax Code, is distinct from the claims for government securities, which are also false, but do not impli-

a false distinction, as the municipalities' claims for interest payments on the bonds in the escrow accounts are false precisely because of the associated violation of the Tax Code. As the District Court recognized: "While far more complex than most income tax schemes, at its heart, this alleged fraud was still focused on the wrongful preservation of a tax-free status." *Lissack*, 2003 WL 21998968, at *6, 2003 U.S. Dist. LEXIS 14600, at *23. We agree and therefore conclude that Lissack's FCA claim is barred by the express terms of the Tax Bar.

Furthermore, the violations alleged to have occurred in this case are subject to suit by the IRS, as evidenced by the fact that the IRS has the authority to enforce the provisions requiring that municipalities rebate any positive arbitrage to the United States. 26 U.S.C. § 148(f). The IRS can thus remedy all of the damage caused by this scheme by seeking to recover the positive arbitrage, which as noted above, exactly equals the amount Lissack claims the Government lost as a result of Sakura's alleged fraud. The IRS in fact participated in the early stages of this case and reached settlements with a number of the original defendants. *Lissack*, 2003 WL 21998968, at *6, 2003 U.S. Dist. LEXIS 14600, at *28 ("Indeed, in this action, the IRS has been a party to twenty-seven settlement agreements entered into by other defendants alleged to have committed fraud in connection with the advance refunding of tax exempt municipal bonds."). The IRS has participated in other cases involving similar claims. *See Harbor Bancorp v. Comm'r of Internal Revenue*, 115 F.3d 722, 727 (9th Cir.1997) (IRS classification of municipal bonds as arbitrage bonds), *City of New Orleans v. Smith Barney*, Civ. No. 98–1767, 1999 WL 288797, *5, 1999 U.S. Dist. LEXIS 6924, *4–*7 (E.D.La. May 7, 1999) (IRS classification of municipal bonds as arbitrage bonds in yield-burning scenario similar to the present case).[10] Additionally, the IRS has issued policy statements addressing yield-burning practices identical to those at issue in this case. *See* Rev. Proc. 96–41, 1996–2 C.B. 301 ("This revenue procedure applies to an issuer of state or local bonds that has used the proceeds of state or local bonds sold prior to July 19, 1996, to pay more than fair market value for nonpurpose investments deposited into an advance refunding escrow. It provides a

---

cate the Tax Code. *See United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir.2002) ("The False Claims Act, then, focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme."); *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir.1995) ("[T]he [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment."). The distinction Lissack makes is irrelevant here because the claims for the federal securities are themselves false precisely because of the associated false statements and violations of the Tax Code. Because Lissack's case implicates both false claims and false statements, the case falls within the language of the Tax Bar.

10. The *City of New Orleans* case is instructive as it involves the same type of fraud as that at issue here. *See City of New Orleans*, 1999 WL 288797, at *6, 1999 U.S. Dist. LEXIS 6924, at *10–*17. That case did not involve FCA claims based on the yield-burning allegations; plaintiffs there requested a declaratory judgment indemnifying the municipality from any claims occasioned by the loss of tax-exempt status for the bonds, and pursued other Securities Act, Investment Advisers Act, and state law claims. *Id.* 1999 WL 288797, at *6, 1999 U.S. Dist. LEXIS 6924 at *16–*17. The court recognized that the IRS could seek to recover the positive arbitrage but held the action was not ripe until the IRS made a final determination that the bonds in question would be subject to taxation. *Id.* 1999 WL 288797, at *6, 1999 U.S. Dist. LEXIS 6924, at *22–*23.

program under which an issuer may request a closing agreement pursuant to which the purchase of those investments alone will not be sufficient to cause §§ 103(b)(2) and 148 of the Internal Revenue Code to apply to those bonds.").

The two possible consequences of Sakura's alleged fraud further demonstrate to us that Lissack's claim falls within the IRS's jurisdiction to remedy. First, the advance refunding bonds might lose their tax-exempt status because of the violations of the anti-arbitrage rules. In that event, however, the IRS could seek to recover from bondholders taxes on interest that the bondholders thought was tax exempt. *City of New Orleans*, 1999 WL 288797, at *6, 1999 U.S. Dist. LEXIS 6924, at *6 ("When the IRS determines that the tax-exempt status is thus destroyed, it can require the owner of the refunding bonds to file amended tax returns and pay unexpected income tax on the interest payments."). Alternatively, the bond issuer could rebate to the IRS the difference between the proper yield and the yield actually realized, thereby preserving the tax-exempt status of its bonds. *See id.* 1999 WL 288797, at *6, 1999 U.S.Dist. LEXIS 6924, at *6–*7.[11] Either way, the IRS can recover for the consequences of anti-arbitrage rule violations. And, if the issuer pays the IRS to maintain the tax-exempt status of its bonds—which would appear to be the most likely scenario—the amount paid by the municipality to maintain tax-exempt status would be identical to the positive arbitrage that Lissack seeks to recover from Sakura.[12] In other words, all that Lissack is attempting to accomplish here is to recover amounts that the IRS can recover for the Government on its own under the Tax Code.

Both the IRS's involvement in policing the sort of fraud alleged by Lissack and the IRS's ability to recover for the Government the precise amounts that Lissack seeks in his FCA action indicate to us that Lissack's claims fall within the scope of the Tax Bar. These factors implicate the evident purpose of the Tax Bar, which is to prevent private litigants from interfering with the IRS's efforts to enforce the tax laws. *See United States ex rel. Fallon v. Accudyne Corp.*, 880 F.Supp. 636, 639 (D.Wis.1995) ("Since such fraud is directly addressed and remedied by the Internal Revenue Code it follows that Congress would not intend to duplicate those remedies with an FCA claim arising from the identical conduct. Not surprisingly, such claims are now expressly excluded from application of the FCA.").

Lissack relies heavily upon two decisions that he claims conflict with our conclusion. In *United States v. Raymond & Whitcomb Co.*, 53 F.Supp.2d 436 (S.D.N.Y.1999), the defendant falsely claimed that it was eligi-

---

**11.** *See* 26 C.F.R. § 1.148–0 ("To accomplish these purposes, section 148 restricts the direct and indirect investment of bond proceeds in higher yielding investments and requires that certain earnings on higher yielding investments be rebated to the United States."); *see also City of New Orleans*, 1999 WL 288797, at *6, 1999 U.S. Dist. LEXIS 6924, 1999 U.S. Dist. LEXIS 6924, at *6–*7. ("There exists a 'closing agreement program' for issuers to protect the tax-exempt status of advance refunding bond issues affected by escrow overpricing. In essence, the IRS collects the difference between the amount paid for the Treasury securities and the spot price for the Treasury securities, plus interest. By doing so, the tax-exempt status of the bonds is maintained and the issuer avoids the risk that their advance refunding bonds will be declared taxable arbitrage bonds.") (internal citations and quotation omitted).

**12.** Even though the IRS would recover from municipal bond issuers in the first instance, Sakura would ultimately be liable for the positive arbitrage brought about by its violation of the Treasury regulations.

ble for the non-profit mailing rate under the Postal Service regulations and thereby paid almost $400,000 less for postage than it otherwise would have. *Id.* at 440. Lissack points out that the non-profit postal rates in question specifically depended on establishing non-profit status under the Tax Code, which he seeks to analogize to the underlying violations of the arbitrage provisions in this case. Lissack also relies on *United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362 (7th Cir.1992), in which false claims, including a false tax return, were made as part of an application for a guaranteed loan from the Small Business Administration ("SBA"). *Id.* at 1364. Lissack emphasizes that both cases proceeded under the FCA without regard to the Tax Bar.

The cases relied upon by Lissack cannot carry the weight requested of them. First, neither court even mentioned the Tax Bar, and there is nothing to indicate that those courts even considered the Tax Bar. Therefore, *Raymond & Whitcomb* and *Cicero* say nothing that is contrary to the conclusions we reach in this case. Second, and more importantly, establishing the falsity of the claims at issue in those cases did not require an assessment of compliance with the Tax Code and those claims did not rise or fall based on a violation of the Tax Code. The claims in *Raymond & Whitcomb* and *Cicero* were false because they violated Postal Service and SBA rules; the Tax Code was involved only in an incidental fashion. *Raymond & Whitcomb*, 53 F.Supp.2d at 441; *First Nat'l Bank of Cicero*, 957 F.2d at 1364–65. Here, by contrast, the claim that Lissack seeks to pursue under the FCA is part of a scheme organized and governed entirely

under the provisions of the Tax Code and Lissack's claim is entirely dependent upon establishing a violation of the Tax Code. Furthermore, in *Raymond & Whitcomb* and *Cicero*, the IRS was not the governmental body with principal authority to prosecute the alleged fraud. Here, however, the IRS has complete jurisdiction over the fraud alleged and can recover for the Government the precise amounts that Lissack seeks to recover under the FCA. Thus, for the reasons we find the present case to fall within the heartland of the Tax Bar provision, the *Raymond & Whitcomb* and *Cicero* cases cannot be considered precedent to the contrary.

Accordingly, we hold that the Tax Bar prohibits Lissack's FCA claim because the falsity of the claim he asserts depends entirely upon establishing a violation of the Tax Code and the IRS has authority to recover the exact amounts he seeks to recover in his FCA action.[13]

## IV.

The judgment of the District Court is hereby affirmed.

---

**13.** We intimate no view as to whether the Tax Bar would apply if one of these two conditions were not met—*i.e.,* if the IRS could not recover the exact amount sought by the rela-

tor or the falsity of the claim asserted did not depend entirely on establishing a violation of the Tax Code.