Leibensperger, Edward P., J.
Plaintiff, Phone Recovery Services, LLC (PRS), brings this action under the Massachusetts False Claims Act[3] (MFCA), G.L.c. 12, §§5A—50, inserted by St. 2000, c. 159,18, against defendants, various mobile telecommunications or telephone exchange companies. PRS asserts a claim on behalf of the Commonwealth concerning defendants’ obligation to collect a surcharge from subscribers and users of communication services. The surcharge is collected for expenses associated with services provided in connection with a statewide 911 emergency public safely system. PRS contends that defendants failed to bill, collect, report and remit the required amount for each line capable of reaching a 911 operator. As a result, defendants allegedly misrepresented to the Commonwealth the information regarding the amount of phone line charges that are subject to the 911 surcharge, causing substantial monetary losses to the Commonwealth.
Defendants filed a joint motion to dismiss PRS’s First Amended Massachusetts False Claims Act Complaint (complaint) pursuant to Mass.R.Civ.P. 12(b)(6). PRS opposes the motion. For the reasons stated below, the defendants’joint motion to dismiss will be allowed.
BACKGROUND
The facts as revealed by the complaint and the relevant statutes are as follows.
PRS is the relator[4] in this action. It is a New Jersey limited liability corporation. PRS served the Massachusetts Attorney General with a copy of the complaint pursuant to the MFCA. On December 3, 2014, the Commonwealth filed a notice of its statutory election not to intervene pursuant to G.L.c. 12, §5C(4). Defendants, Verizon of New England, Inc., XO Massachusetts, Inc., United Business Telephone, Inc., Comcast Business Communications, LLC, YMAX Communications Corp., Paetec Communications, Inc., and John Does 1 through 75, are entities that provide telephone exchange services in Massachusetts.
In 2007, the Commonwealth established a 911 emergency telephone system (911 system) within the Division of Telecommunications and Cable. The 911 system is jointly administered by the Massachusetts Department of Public Safety. According to PRS, the 911 system was established to provide a stable source of revenue to fund the Commonwealth’s 911 Emergency Telephone System Account, which pays for the installation, operation, and maintenance costs of the statewide enhanced 911 network, including wireless enhanced 911 services. The 911 system is also used *103 to fund the Commonwealth’s costs arising from emergency response and emergency response training.[5]
The Commonwealth funds the 911 system through general appropriations and, in addition, through a $0.75 monthly surcharge imposed on each mobile telecommunications customer who uses the number primarily in Massachusetts. By statute, the surcharge is assessed to each subscriber or end user of communications systems. See G.L.c. 6A, §18H (‘There shall be imposed on each subscriber or end user whose communication services are capable of accessing and utilizing an enhanced 911 system, a surcharge in the amount of 75 cents per month for expenses associated with services provided . . .”). The mobile telecommunications company assesses the surcharge pursuant to 220 Code Mass. Regs. §16.03 and 560 Code Mass. Regs. §3.04. The Commonwealth also funds the 911 system through a $0.75 monthly surcharge imposed on each customer charged by a telephone exchange company for each voice grade access telephone number provided to the customer with a service address in Massachusetts. Mobile telecommunications companies and telephone exchange companies are required to collect the $0.75 surcharge on a monthly basis for “each and every voice grade line and mobile phone.” They are also required to pay the amounts collected on a quarterly basis to the 911 Division within the Department of the Treasury. Moreover, each mobile telecommunications company and telephone exchange company is liable for the surcharge imposed and must itemize and separately identify the surcharge on a customer’s monthly bill. The Massachusetts Department of Revenue has established instructions and forms for mobile telecommunications companies and telephone exchange companies to report and remit the surcharges it has collected on a quarterly basis.
PRS claims that “(u]pon information and belief, the defendants have and are presently engaged in a practice that has resulted in the under-collection of the 911 assessment that they are required to collect and remit to the Commonwealth of Massachusetts for payment pursuant to Massachusetts law.” Complaint at para. 21. PRS asserts that defendants have benefit-ted by failing to comply with Massachusetts law. Relying on data from the Federal Communications Commission (FCC), PRS believes that Massachusetts has an operating base of approximately 9.9 million non-mobile telephone voice grade access lines (e.g., landlines). Based on this data, PRS alleges that the amount of 911 surcharges that should be collected from landline phones in Massachusetts each year is approximately $89.8 million.
Based on data reported to the FCC by the Commonwealth on 911 collection of surcharges in 2012, Massachusetts anticipated collecting $80 million per year in 911 surcharges: $49.6 million in mobile surcharges and only $30.4 million in 911 surcharges from landlines. PRS contends that in 2012, “Massachusetts experienced an annual shortfall in collections of 911 fees ... in the range of $36 million per annum from landlines . . . alone.” Complaint at pars. 24. In addition, PRS claims that surcharges are not being paid on phones associated with the Lifeline Program for low-income consumers. Thus, PRS estimates that since the Commonwealth established the MFCA in 2000, it has experienced lost revenues of $214,079,323 based on defendants’ purported failure to collect 911 surcharges. Complaint at para. 25. PRS asserts that defendants purposefully and knowingly failed to file accurate and truthful reports to the Commonwealth and that the Commonwealth was not aware of the amounts not collected by defendants because that information is in the control of defendants. This, PRS claims, resulted in a substantial loss of revenue for the Commonwealth.
PRS’s complaint contains three counts: false claims action and declaratory judgment (Count I), breach of fiduciary duty (Count II), and injunctive relief (Count III). PRS’s MFCA claim in Count I is based on the following allegations: Massachusetts law requires defendants to collect, report, and remit surcharges to the Commonwealth. Defendants knowingly failed to charge their customers the statutory surcharge required or only charged a portion of the statutory surcharge. Defendants knowingly provided false information to the Commonwealth in order to conceal, avoid, or decrease their financial obligations under the law. The Commonwealth lacks information to sufficiently identify the total number of false records or statements contained in the reports submitted to the Commonwealth because this information is solely in defendants’ custody. As a result of these actions, the Commonwealth has not received the statutory surcharges it is entitled to receive under the law, and the Commonwealth and the general public have been harmed.
DISCUSSION
To survive a motion to dismiss, the plaintiffs “[factual allegations must be enough to raise a right to relief above the speculative level... [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)...” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2006), citing Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007). In other words, “[w]hile a complaint attacked by a . . . motion to dismiss does not need detailed factual allegations ... a plaintiffs obligation to provide the ‘grounds’ of his ‘entitle[ment] to relief requires more than labels and conclusions . . .” Iannacchino, 451 Mass, at 636, quoting Bell Atl. Corp., 127 S.Ct. at 1966. Dismissal under Mass.R.Civ.P. 12(b)(6) is properwhere a reading of the complaint establishes beyond doubt that the facts alleged do not support a cause of action which the law recognizes, such that the plaintiffs claim is legally insufficient. Nguyen v. William Joiner Center for *104 the Study of War and Social Consequences, 450 Mass. 291, 295 (2007).
Defendants argue, among other things, that PRS’s MFCA claim in Count I should be dismissed because the 911 surcharges at issue are “taxes” and fall under the MFCA’s express tax bar. Under the MFCA, the statute “shall not apply to claims, records or statements made or presented to establish, limit, reduce or evade liability for the payment of tax to the commonwealth or other governmental authority.” G.L.c. 12, §5B(d). The MFCA’s tax bar provision is similar to the tax bar contained in the Federal False Claims Act, which states: “This section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986.” 31 U.S.C. §3729(d). See United States ex rel. Lissack v. Sakura Global Capital Markets, Inc., 377 F.3d 145, 152-53 (2d Cir. 2004) (recognizing that tax bar was intended to reserve discretion to prosecute tax violations to the Internal Revenue Service and bar False Claims Act actions based on tax violations).
PRS contends, however, that the 911 surcharges at issue are “fees” and not taxes. It argues that the 911 surcharges qualify as fees based on the three-factor analysis discussed below and, thus, its MFCA claim in Count I properly states a claim upon which relief can be granted. Accordingly, the threshold issue is whether the 911 surcharges are “fees” or “taxes.” Where, as here, the Legislature did not use either the word “fee” or the word “tax” in describing the surcharge, the Supreme Judicial Court recognizes that “the nature of a monetary exaction ‘must be determined by its operation rather than its specially descriptive phrase.’ ” Emerson College v. Boston, 391 Mass. 415, 424 (1984), quoting Thomson Sec. Welding Co. v. Commonwealth, 275 Mass. 426, 429 (1931). “In any doubtful case, the intention of the Legislature, as it may be expressed in part through its characterization [of the charge] . . . deserves judicial respect, and especially so where the constitutionality of the exaction depends on its proper characterization.” Associated Indus. of Mass., Inc. v. Commissioner of Revenue, 378 Mass. 657, 667-68 (1979).
Beyond the language of the statute describing the required monetary extraction,[6] Massachusetts courts generally look to three factors to distinguish fees from taxes. “Fees ‘[1.] are charged in exchange for a particular government service which benefits the party paying the fee in a manner not shared by other members of society’!;]... [2.] are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the chargef;] • • • and [3.] . . . are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses.” Denver Street, LLC v. Saugus, 462 Mass. 651, 652-53 (2012), quoting Emerson College, 391 Mass, at 424-25. See also, National Cable Tel. Ass’n v. United States, 415 U.S. 336, 341 (1974) (‘Taxation is a legislative function, and Congress, which is the sole organ for levying taxes, may act arbitrarily and disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income. A fee, however, is incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society”).
Moreover, in connection with determining whether a charge is a fee or a tax, courts recognize that there are two types of fees: “user fees, where a fee is assessed for the use of the governmental entity’s property or services; and regulatoiy fees, where a fee is assessed as part of government regulation of private conduct.” See Murphy v. Massachusetts Turnpike Auth., 462 Mass. 701, 705-11 (2012) (concluding that tolls collected from users in the Metropolitan Highway System were user fees and not taxes). When considering the three factors discussed above, the second factor, vol-untariness, is not relevant in determining whether a regulatory charge is a fee or a tax and may only retain relevance where it is applied to user fees. Id. at 705, n.14. See Silva v. Attleboro, 454 Mass. 165, 172 (2009).
The 911 surcharge at issue here has the attributes of a tax, not a fee. The 911 charge does not share the traditional characteristics of a user fee when the three-factor analysis discussed above is applied.
First, those who pay the 911 surcharge are not assessed in exchange for a particular use of a government service. The benefit to them for paying the fee is the same as all other members of society. The Legislature defined the term “enhanced 911 service” as follows: “a service consisting of communication network, database and equipment features provided for subscribers or end users of communication services enabling such subscribers or end users to reach a PSAP by dialing the digits 911, or by other means approved by the department, that directs calls to appropriate PSAPs based on selective routing and provides the capability for automatic number identification and automatic location identification.” G.L.c. 6A, §18A. A “PSAP” or “public safety answering point” is “a facility assigned the responsibility of receiving 911 calls and, as appropriate, directly dispatching emergency response services or transferring or relaying emergency 911 calls to other public or private safety agencies or other PSAPs.” Id. In Massachusetts, anyone who uses a landline or mobile phone and dials the numbers “9-1 -1" has access to communication with a PSAP and trained individuals responsible for dispatching emergency services. The user has such access regardless of whether he or she was assessed or paid the surcharge. See Bay Area Cellular Telephone Co. v. City of Union City, 75 Cal.Rptr.3d 839, 846 (Cal.Ct.App. 2008) *105 (concluding that fee imposed on telephone lines to fund 911 emergency communication system was a special tax). See also Fulton County v. T-Mobile, South, LLC, 699 S.E.2d. 802, 307 (Ga.Ct.App. 2010) f‘[T]hose who pay the 9-1-1 charge—whether T-Mobile or its customers—receive no benefit not received by the general public, because all members of the public may access the 9-1-1 system. As such, the charge is a tax”); Kessler v. Hevesi, 846 N.Y.S.2d 56, 57 (N.Y.App.Div. 2007) (rej ecting argument that monthly 911 surcharge was a taking because it is a user fee rather than a general tax). Proof of payment of the 911 surcharge is not a prerequisite to obtaining emergency dispatch services, and all members of society have an equal opportunity to communicate with PSAPs in an effort to seek emergency response services. Moreover, all members of society experience benefits from a swift and efficient 911 emergency dispatch service: crimes may be prevented or criminals deterred; individuals in need of urgent medical attention may be treated or transported to hospitals; and fires may be quickly put out before they spread to multiple buildings. Emerson College, 391 Mass, at 425-26 (fire protection charge is a tax, not a fee, because the benefits of the charge are not limited to the payer of the charge but extend to the public at large). See also Kessler, 846 N.Y.S.2d at 57 (reasoning that 911 surcharge ’’pays for services received by, and for the benefit of, the general public" and that these “benefits flow to the general public because everyone—not just wireless telephone users—benefits from the enhancements to 911 service”). Hence, those subject to 911 charges do not receive a particular benefit separate from other members of society.[7]
The second factor to consider is whether the 911 surcharge is paid by choice, in that the party paying it has the option of not utilizing the governmental service and avoiding the charge. Denver Street, LLC, 462 Mass, at 652. The 911 charges are not voluntary. Landline and mobile phone customers who are responsible to pay their phone bill are required to pay the $0.75 monthly 911 surcharge. The surcharge is levied, however, to provide a benefit to the general public welfare. Like the property owner in Emerson College, any person needing the emergency services of the 911 system has no reasonable alternative consistent with public safety other than to use the system. Emerson College, 391 Mass, at 426 (the “ ‘use’ of [fire protection] is compelled”). It is not as if the paying party could simply choose another route to avoid Massachusetts turnpike fees. See Murphy v. Massachusetts Turnpike Auth., 462 Mass, at 710.
The third factor to consider is whether the 911 surcharge is collected to raise revenue or to compensate the governmental entity providing the service for its expenses. Denver Street, LLC, 462 Mass, at 652. The third factor, “while not decisive, is of weight” in determining whether a charge is a fee or a tax.[8] Emerson College, 391 Mass, at 427. PRS concedes in its complaint that the monthly 911 charges are used to fund a broad range of governmental emergency functions, including the installation and ongoing operating and maintenance costs of the 911 network and the cost of emergency response training, among other things. PRS also concedes that “[t]he 911 system is funded by the Commonwealth through appropriations, and through the establishment of a $0.75 monthly surcharge fee ...” Complaint at para. 14. The Legislature provided that: “Each communication service provider shall remit the surcharge revenues collected from its subscribers or end users to the state treasurer for deposit in the Enhanced 911 Fund. The surcharge revenues shall be expended for the administration and programs of the department including, but not limited to, salaries, enhanced 911 training programs, enhanced 911 public education programs, the creation of PSAP customer premises equipment for, and maintenance of, primaiy and regional PSAPs, the programs mandated by section 18B and sections 14A and 15E of chapter 166, and for the implementation and administration of enhanced 911 service in the commonwealth.” G.L.c. 6A, §18H(d). The Legislature clearly intended for the monies collected from the 911 charges to be used for the implementation and administration of 911 services in the Commonwealth to benefit the general welfare. The broad range of permitted expenditures confirms that the 911 surcharges were intended to raise revenue, not merely to compensate for a particular service to a particular group. The money raised is revenue that would otherwise be taken from the general fund. See Complaint at para. 14 (asserting that 911 system is funded by the Commonwealth through appropriations and through monthly surcharge fees).
In sum, after considering the three factors discussed above, I conclude that the 911 surcharge at issue in this case is a tax, and not a fee. Consequently, PRS’s MFCA claim in Count I is precluded by the MFCA’s tax bar, and Count I must be dismissed.[9] See G.L.c. 12, §5B(d). As a result of the dismissal of Count I, PRS’s other claims fail. PRS has no authority to bring a claim for breach of fiduciary duty or for an injunction on behalf of the Commonwealth because the MFCA provides the exclusive means for a private party to assert a claim on behalf of the Commonwealth.
ORDER
The Defendants’ Joint Motion to Dismiss First Amended Massachusetts False Claims Act Complaint is ALLOWED. Phone Recovery Services, LLC’s First Amended Massachusetts False Claims Act Complaint shall be DISMISSED WITH PREJUDICE as to Phone Recovery Services, LLC and shall be DISMISSED WITHOUT PREJUDICE as to the Commonwealth of Massachusetts. The court will provide a copy of this decision to the Commonwealth, and the Common *106 wealth shall have until December 9, 2015 to file a response, if any, to this decision.[10] .

 Under the MFCA, “Any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of this subsection; . . . shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per violation plus 3 times the amount of damages, including consequential damages, that the commonwealth or a political subdivision thereof sustains because of such violation.” G.L.c. 12, §5B(a).

 General Laws c. 12, §5A defines a “[r]elator” as “an individual who brings an action under paragraph (2) of section 5C.” See Scannell u. Attorney General, 70 Mass.App.Ct. 46, 48-49 (2007) (explaining that the MFCA encourages individuals with direct and independent knowledge of information that a particular entity is defrauding the Commonwealth to come forward by awarding these individuals with a percentage of the Commonwealth’s recovery from the defrauding entity and that an individual attains status of a “relator” by filing suit against the defrauding entity in Superior Court in the name of Commonwealth).

 PRS specifically alleges that: ‘The 911 System is also used to fund the Commonwealth’s capital equipment, facilities and operating costs arising from emergency response, the cost of emergency response training and related expenses of the services, the cost of operating Emergency Telecommunications Services, the cost of operating the 911 system and costs associated with implementing the requirements of the Federal Communications Commission concerning 911 service that is not otherwise allocated to a carrier or eligible for reimbursement, and any cost associated with planning, designing or acquiring replacement equipment or systems related to the enhanced 911 network.” Complaint at para. 13.

 It is noted that Black’s Law Dictionary (9th ed. 2009) defines “surcharge" as “(a]n additional tax, charge, or cost.”

 PRS cites an Alabama Supreme Court case, T Mobile South, LLC v. Bonet, 85 So.3d 963, 982-85 (Ala. 2011), in which the court concluded that 911 service charges were fees and not taxes and noted that the money collected from the service charges did not provide general revenue that could be used for any purpose. I respectfully decline to follow the reasoning of that case.

 Arguably, this court is not required to consider the third factor, given the analysis discussed above. See Emerson College, 391 Mass, at 427 (noting that court “need go no further” to analyze the third factor and sustain the lower court’s conclusion that the charge at issue was a tax and not a fee).

 defendants moved to dismiss Count I on several other grounds. Because of my determination that the surcharge is a tax, not a fee, it is unnecessary to address the other grounds for dismissal.

 In its notice of election to decline intervention, citing G.L.c. 12, §5C(2), the Commonwealth requested notice prior to dismissal of this action. See G.L.c. 12, §5C(2) (“An individual, hereafter referred to as relator, may bring a civil action in superior court for a violation of said sections 5B to 50, inclusive, on behalf of the relator and the commonwealth or any political subdivision thereof. The action shall be brought in the name of the commonwealth or the political subdivision thereof. The action may be dismissed only if the attorney general gives written reasons for consenting to the dismissal and the court approves the dismissal”).