DENVER STREET LLC *vs.* TOWN OF SAUGUS
(and three companion cases[1]).

Essex. January 6, 2012. - June 29, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Constitutional Law,* Taxation. *Taxation,* Sewer assessment. *Municipal Corporations,* Sewers, Fees. *Sewer.*

In an action brought in Superior Court, the judge erred in concluding that a monetary charge imposed on the plaintiff developers for access to the defendant town's sewer system constituted an illegal tax rather than a permissible fee, where the developers were paying a reasonable amount for a sufficiently particularized benefit (i.e., accelerated access to the town's sewer system) [657-661]; and where, in light of the terms of an administrative consent order between the town and the Department of Environmental Protection, the charges were reasonably designed to compensate the town for anticipated expenses [661-666].

CIVIL ACTIONS commenced in the Superior Court Department on November 8, 2005, December 9, 2005, and May 26, 2006.

After consolidation, the cases were heard by *Frances A. McIntyre,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Ira H. Zaleznik* for town of Saugus.

*James R. Senior* for Denver Street LLC & others.

The following submitted briefs for amici curiae:

*John L. Davenport* for Conservation Law Foundation, Inc.

*Martha Coakley,* Attorney General, *& Louis Dundin,* Assistant Attorney General, for the Commonwealth.

*Ben Robbins & Martin J. Newhouse* for New England Legal Foundation & another.

---

[1] Paul DiBiase, trustee of Oak Point Realty Trust *vs.* Town of Saugus; Kevin Procopio, trustee of Vinegar Hill Estates Trust *vs.* Town of Saugus; and Central Street Saugus Realty, LLC *vs.* Town of Saugus.

IRELAND, C.J. We granted the town of Saugus's (town's) application for further appellate review in these consolidated cases to determine whether a monetary charge imposed on the plaintiff developers (developers) for access to the town's sewer system is a lawful fee or an impermissible tax. After a bench trial, a Superior Court judge found that the charge was an unlawful tax. The Appeals Court affirmed. *Denver St. LLC* v. *Saugus*, 78 Mass. App. Ct. 526, 528, 533-534 (2011). Because we conclude that the charge in this case has the requisite characteristics of a fee rather than an impermissible tax, we reverse the judgments and enter judgments for the town.

*Background.* A recitation of the relevant legal principles is in order.

"A municipality does not have the power to levy, assess, or collect a tax unless the power to do so in a particular instance is granted by the Legislature." *Silva* v. *Attleboro*, 454 Mass. 165, 168 (2009), quoting *Commonwealth* v. *Caldwell*, 25 Mass. App. Ct. 91, 92 (1987). However, a fee lawfully may be charged. *Silva* v. *Attleboro, supra* at 168-169. There are two kinds of fees, "user fees based on the rights of the entity as proprietor of the instrumentalities used" and "regulatory fees," "founded on police power to regulate particular businesses or activities." *Emerson College* v. *Boston*, 391 Mass. 415, 424 (1984) (*Emerson College*), citing *Opinion of the Justices*, 250 Mass. 591, 597, 602 (1925).

In *Emerson College*, this court stated that "the nature of a monetary exaction 'must be determined by its operation rather than its specially descriptive phrase.' " *Emerson College, supra*, quoting *Thomson Elec. Welding Co.* v. *Commonwealth*, 275 Mass. 426, 429 (1931). There are three "traits" that distinguish fees from taxes. Fees "[1.] are charged in exchange for a particular government service which benefits the party paying the fee in a manner 'not shared by other members of society'[;] . . . [2.] are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge[;] . . . and [3.] . . . are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses." *Emerson College, supra* at 424-425, quoting *National Cable Tel. Ass'n* v. *United States*,

415 U.S. 336, 341 (1974). The burden is on the party challenging the fee to prove it is not lawful. See *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgt. Bd.*, 421 Mass. 196, 201 (1995). "Fees are not taxes," even if the only way to avoid payment is to relinquish the right to develop one's property. *Bertone* v. *Department of Pub. Utils.*, 411 Mass. 536, 549 (1992), citing *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass. 395, 402 (1985).

*Facts and procedure.* We summarize the essential facts taken from the judge's findings, supplemented by uncontested facts in the record, and reserve certain details for our discussion. *Millennium Equity Holdings, LLC* v. *Mahlowitz*, 456 Mass. 627, 630 (2010).

Since at least 1986, the town had a deteriorating sewer system. Defects allowed inflow and infiltration (I/I)[2] in the system. Certain rain storms or other "wet weather events" overwhelmed the system's capacity, causing sanitary sewer overflow (SSO). The result was the release of untreated waste water and raw sewage, which contaminated the ocean and "river tributaries and wetlands," posing a "public health and environmental risk." Moreover, to avoid SSO onto residential property or into housing, the town had installed, without proper approval or permits, a bypass pump at one of its pumping stations that discharged raw sewage into the Saugus River (river), affecting it, as well as Rumney Marsh, an "area of critical environmental concern."

In 2005, the town entered into an administrative consent order (ACO) with the Department of Environmental Protection (department). The ACO noted that the town had had an evaluation of its sewer system in 1997, which found "numerous deficiencies" including "leaking manholes, mainlines and service lines, . . . [and blocked] sewer pipes," as well as "illegal connections of sump pumps, driveway drains, and storm drains into the sewer system." These deficiencies "allegedly" went unaddressed by the town. The ACO further stated that the town's actions violated the

---

[2]Infiltration is groundwater that leaks into a sewer system through defective pipes, pipe joints, and sewer connections. Inflow is extraneous water that enters a sewer system from public sources such as manhole covers and from private sources such as roof drains and sump pumps. Both infiltration and inflow increase the volume of liquid in a sewer system that can lead to overburdening and overflow.

Clean Water Act, G. L. c. 21, §§ 43 and 44, as well as regulations concerning surface water, and operation and management. See 314 Code Mass. Regs. § 3.03 (2003); 314 Code Mass. Regs. §§ 12.02-12.04 (1997).

In addition to being fined $25,000 by the department, the town was required to pay fines for any violation of the terms of the ACO, until the town "correct[ed] the violation or complete[d] performance whichever is applicable." Under the ACO, the town was required to implement plans to identify and eliminate sources of I/I, and there was a moratorium on any new connection to the sewer system until the I/I problem was addressed. The town embarked on a ten-year, $27 million dollar plan to repair the system that would result in the reduction of I/I (plan). Ratepayers were to finance the majority of the plan. By the time of trial in 2009, the town had expended approximately $6.5 million to remove some 450,000 gallons of I/I from the sewer system. The funding came from a town bond issue and a loan from the State revolving fund, i.e., funds separate from the monies at issue here.

In order to allow new connections to the system while the I/I problem was being addressed incrementally under the plan, the ACO permitted the town to establish a "sewer bank," which was a mechanism for calculating, in gallons, when I/I reduction was such that new flow into the system would be permitted. The town had to demonstrate that it had the "technical, financial and managerial capacity to operate" a sewer bank in order to obtain permission to establish it. To that end, the town had to create a sewer connection and extension policy for new users, such as the developers here, that had to be approved by the department (new connection policy).

Moreover, before any new connections would be allowed, the sewer bank had to have enough I/I reduction to accommodate the new flow. The ACO specified a formula to determine the ratio of gallons of I/I that had to be removed from the system in order for one gallon of new flow to be allowed into the system. For example, until the town made repairs that removed 250,000 gallons of I/I from the system, the town was allowed to add one gallon of flow for every ten gallons of I/I removed; when the town had removed 500,000 gallons of I/I, that ratio would be

one gallon of flow added for every four gallons of flow removed.[3,4] The ACO required that the net effect of any new flow had to be a decrease in flow, i.e., a one-to-one trade-off between gallons allowed and gallons removed would not be acceptable because the goal was to eliminate I/I.

In addition, the ACO stated that the department had "the right to disapprove any proposed addition of flow credit to the [s]ewer [b]ank" and that each time the town allowed any new flow, it was required to "reduce the [s]ewer [b]ank [b]alance by the approved design flow." There was testimony that the department did not always agree with the town's measurement of the I/I reduction. See note 17, *infra*, and accompanying text.

The town requires all developed commercial or residential properties to connect to the sewer system. While it addressed the I/I problem, the town handled permits for new connections by requiring payment of a charge called an I/I reduction contribution (I/I charge). The amount of the I/I charge was calculated first by multiplying, by a factor of ten, the number of gallons of new flow proposed to be generated by a developer's project and discharged into the sewer.[5] As the town reduced the I/I flow through repairs, the factor by which the number of gallons of new flow was multiplied also decreased, so that by December, 2007, the factor was four. Although the ACO required the town to demonstrate that it had the financial capability to operate the

---

[3]In her written decision, the judge stated that the town "freely negotiated" the ten-to-one ratio. This contradicts several other findings and the stipulated facts, as well as the testimony of the engineer who stated that the ten-to-one ratio was imposed by the department. Although the administrative consent order (ACO) was negotiated between the town and the department, there is no indication that the department would have allowed anything less than a ten-to-one ratio because, as the judge herself found, the problem was so severe. Indeed, the ACO states that "the Department shall allow" the town the ten-to-one ratio, as well as the reduced ratios, described above, as more gallons of I/I were removed. In addition, one of the agreed facts states that the department "allow[ed]" the town the ten-to-one ratio.

[4]The town had removed 500,000 gallons by the beginning of 2006, and by December, 2007, the ratio was one gallon of new flow added for every four removed. Apparently, the town began removing I/I before the ACO was signed so that the town was able "to keep a positive balance in the sewer bank."

[5]Three dollars was the estimated cost of repairing leaks to the system sufficient to remove one gallon of I/I. The judge found that the real cost was higher than this amount, from some four dollars to four dollars and fifty cents per gallon to thirteen to fourteen dollars per gallon.

sewer bank, and the sewer bank was the mechanism through which new connections to the system were allowed, the ACO did not require specific use of an I/I charge on new connections to finance the reduction of I/I for credit in the sewer bank.

The developers were required to pay the I/I charge to connect their projects to the sewer system. They had paid a total of $670,460 to accommodate new flow from the single-family houses and multifamily housing they constructed. They filed actions in the Superior Court alleging that the I/I charge was an illegal tax. The cases were consolidated for trial. We note that it is undisputed that the I/I charge is proprietary, not regulatory, in nature.

At trial, the town argued that, under *Emerson College*, the particular benefit the developers received for payment of the I/I charge was accelerated access to the sewer system. The judge's written decision and order set forth findings of fact, in part derived from stipulated facts. In analyzing whether the I/I charge was a fee or a tax, the judge applied the three factors from *Emerson College*. She also relied on the analysis of a sewer connection charge in *Berry* v. *Danvers*, 34 Mass. App. Ct. 507 (1993) (*Berry*), to conclude that the I/I charge provided no particularized benefit to the developers because the public also benefited from the I/I reduction. She found that the amount of the I/I charge was excessive compared to the regulatory costs involved. After determining that the I/I charge was a tax and not a fee, the judge ordered the town to refund the developers' I/I charges, as well as statutory interest, fees, and costs.[6] She denied the town's posttrial motions.

---

[6]Concerning the second factor discussed in *Emerson College* v. *Boston*, 391 Mass. 415, 424-425 (1984) (*Emerson College*), whether payment of the I/I charge was paid by choice, the parties agree that it was voluntary. Therefore, we do not address voluntariness, except to say that it is undisputed that the developers could have avoided the I/I charge by waiting until all repairs were done to the sewer system before connecting. We note, however, that in *Silva* v. *Attleboro*, 454 Mass. 165, 171-172 (2009), this court discussed the usefulness of voluntariness in assessing whether a charge is a fee or a tax. The court noted that other jurisdictions have found voluntariness unhelpful and stated that if the fee was regulatory as opposed to proprietary, voluntariness is of no relevance. *Id.* at 172, and cases cited. The *Silva* case left to another day whether voluntariness was useful where, as here, the fee is proprietary. *Id.* See generally *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgt. Bd.*, 421 Mass. 196, 205 (1995) (*Nuclear Metals*) (choice realistically not "free choice").

*Discussion.* We begin by noting that the judge (and the developers) downplay the central role of the ACO in discussing whether the developers received a particularized benefit for the I/I charge. The ACO required a moratorium on new connections until the system was repaired, which was projected to take ten years to complete. Because of the impracticability of a moratorium, the department "allow[ed]" the town to create the sewer bank in order to permit new flow into the sewer system. Without the sewer bank, the moratorium would have remained in place. No new users would have been allowed to connect to the sewer system, and the developers here would have been unable to occupy or sell the housing they had built, until the town completed the repairs. These facts inform our discussion of the application of the *Emerson College* factors to this case.

1. *"Sufficiently particularized" benefit.* In her written decision, the judge rejected the town's arguments that the developers' particularized benefit was immediate permission to connect to the sewer system and that, because the ACO required a reduction in I/I to accommodate new users, the developers are the only users obligated to pay the I/I charge. She stated that the town's plan for reducing I/I was not designed to pay for any additional infrastructure to accommodate new connections or to cover the costs of physically connecting to the sewer system; the new connection policy provided no other source to finance the repairs to the sewer system except the I/I charge;[7] and, but for the town's failure to keep its sewer system repaired, the I/I problem would not exist. Relying on *Berry, supra,* she also stated that "the I/I reduction offered as much or greater benefit to the larger community, than was afforded to the [developers]." She concluded that the entire purpose of the new connection policy was to reduce I/I flow for the town and, therefore, was not a particularized service being afforded to the developers.

The town argues, in essence, that the judge erred in finding

---

[7]It is not entirely clear, but we assume that the judge was referring to the fact that the cost of I/I reduction to allow new users access to the sewer system was paid by those users. As discussed, the ratepayers were financing the majority of the town's proposed $27 million plan, and the first $6.5 million had been financed through a bond and a loan.

that the I/I charge was an unlawful tax and not a legitimate fee, because the developers were paying a reasonable amount for a particularized benefit: accelerated access to the town's sewer system. The town also contends that the judge erred in relying on *Berry* and argues that, once a particularized benefit is identified, the first *Emerson College* factor is satisfied.

*Berry* concerned sewerage overflows due to I/I in Danvers, which levied a charge on new connections to its sewer system. *Id.* at 508-509. The charge was calculated based on predicted discharge into the sewer system and was used to remove two gallons of I/I from the system for each new gallon of flow added. *Id.* at 509. The Appeals Court determined that, although the "removal of I/I would theoretically benefit new users by freeing up additional capacity and allowing them to connect to the sewer system," the benefit was not "sufficiently particularized" when compared to the benefit I/I removal provided to current users. *Id.* at 510-511, 512.

The *Berry* case distinguished *Bertone v. Department of Pub. Utils.*, *supra* (*Bertone*), a case involving a fee for new users of a municipal lighting plant. *Berry* emphasized the fact that, at the time the fee was charged in *Bertone*, "the existing electrical system was capable of meeting the then-current load, and all necessary maintenance was covered by the rates charged all users for electricity," whereas in *Berry*, the financing was going to "repair problems inherent in the existing system." *Berry*, *supra* at 511-512. Moreover, as part of its analysis whether there was a sufficiently particularized benefit, the court quoted language from *Bertone* that weighed the benefits received by new users of the electrical system against the benefits derived by all customers. *Berry*, *supra* at 511, quoting *Bertone*, *supra* at 546. However, in the quoted portion of *Bertone*, the court was weighing benefits as part of its analysis whether the fee was discriminatory under G. L. c. 164, § 58, a statute governing operation of municipal lighting plants, not whether there was a sufficiently particularized benefit under *Emerson College*. *Bertone*, *supra* at 545-547, 549.

A precise balancing or weighing of public benefits against a particularized benefit is not part of the first *Emerson College* factor. In *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste*

*Mgt. Bd.*, 421 Mass. 196, 202-205 (1995) (*Nuclear Metals*), the court held that an assessment levied against generators of low-level nuclear waste was a valid fee. In analyzing the first *Emerson College* factor, the court considered only whether the plaintiffs were receiving a government service, and because it determined that they were (i.e., disposal of the low-level radioactive waste in compliance with Federal law), the court then considered only whether the service was particularized "in a manner 'not shared by other members of society.' " *Nuclear Metals, supra* at 202, quoting *Emerson College, supra* at 424. Although the court noted that the public received a benefit because it was protected by the safe disposal of low-level radioactive waste, it nevertheless determined that the benefit was sufficiently particularized because it was "the plaintiff . . . that required access to disposal facilities." *Nuclear Metals, supra* at 204. Likewise, in *Silva* v. *Attleboro*, 454 Mass. 165, 171 (2009), the court held that a municipal burial permit charge was a fee because the particularized benefit was a well-regulated industry for the disposal of human remains, even though the court also acknowledged that the public benefited from the preservation of "public health, safety and welfare."

Although the *Nuclear Metals* and *Silva* cases involved regulatory fees, the Appeals Court has decided cases that involved proprietary fees like the I/I charge at issue here, which acknowledged a public benefit but did not weigh it against the particularized benefit. In *Morton* v. *Hanover*, 43 Mass. App. Ct. 197 (1997), the court held that a water rate surcharge, paid by abutters to construct a new water main in an expanding commercial zone, was a valid fee even though the major purpose of the water main was to provide adequate water to fire hydrants, because abutters received the particularized benefit of better water flow and pressure. *Id.* at 198, 201-202 & nn.6,7. In *Commonwealth* v. *Caldwell*, 25 Mass. App. Ct. 91, 94-96 (1987), the court held that a "slip fee" for mooring boats at a public waterfront was valid, where the particular benefit was safety and order provided by the harbormaster, and determined that the public also benefited from the harbormaster's duties.

To the extent that *Berry* established a rule that a court must weigh a particularized benefit against a benefit to the public in

applying the first *Emerson College* factor, we do not follow it.[8] *Emerson College* focused on whether the services for which a fee was imposed "are sufficiently particularized as to justify distribution of the costs among a limited group . . . rather than the general public." *Id.* at 425. This inquiry does not involve an exact measuring or quantifying of the comparative economic benefits of the limited group and the general public. Instead, the inquiry is whether the limited group is receiving a benefit that is, in fact, sufficiently specific and special to its members. *Id.* at 424 (service must benefit fee payer in manner "not shared by other members of society"). Once a sufficiently particularized benefit is found, then the first *Emerson College* factor is satisfied.[9]

Here, by paying the I/I charge, the developers gained immediate access to the sewer system for their new connections, at a time when the town was required to reduce I/I under the ACO. We do not agree with the judge that the main purpose of the new connection policy was to reduce I/I for the entire town. As discussed, the new connection policy was established pursuant to the part of the ACO that specifically addressed the sewer bank, which was the mechanism that allowed new flow to enter the sewer system.[10] The value of the immediate access is related to the sewer bank, without which a moratorium on new connections would have been imposed because, as a witness from the department testified, the new connections would exacerbate the I/I problem. Furthermore, access to the sewer system for new

---

[8]*Nuclear Metals, supra* at 206 n.11, noted that *Berry* v. *Danvers,* 34 Mass. App. Ct. 507 (1993), also was not controlling authority in its analysis of the voluntariness requirement in the *Emerson College* factors.

[9]The *Emerson College* case involved a statute allowing the city of Boston to levy a charge on owners of buildings of a certain size, construction, and use, to reimburse the city for the costs of additional fire fighting equipment and personnel. *Emerson College, supra* at 416. The court held that the charge was neither a tax nor a fee and affirmed the Superior Court judgment invalidating both the statute as well as the city ordinance. *Id.* at 419. The court stated that the charge was not sufficiently particularized because the calculation included not only the cost of fire fighting capacity to preserve an owner's particular building, but also the cost to safeguard the building's inhabitants and to prevent the fire from spreading to other buildings. *Id.* at 426. The court further noted that the charge was compelled. *Id.*

[10]The ACO required the town to create other plans to address I/I; they were not introduced in evidence at trial.

connections was not a benefit shared by anyone other than those who paid the I/I charge.[11]

We also do not agree with the judge or the developers that the fact that the town would have had to pay for all repairs mandated by the ACO is relevant. The purpose of the moratorium on new connections, as well as the sewer bank, was to prevent overwhelming an already impaired sewer system with new flow. The developers could have chosen to wait until those repairs were completed before connecting to the sewer system. We conclude that the I/I charge was sufficiently particularized to satisfy the first *Emerson College* factor.[12]

*2. Purpose of I/I charges.* In assessing the third *Emerson College* factor, whether the I/I charge was designed to compensate the town for its expenses rather than to raise revenue, "the critical question is whether the . . . charges [are] reasonably designed to compensate [the town] for anticipated expenses," *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass. 395, 404 (1985), or to reimburse a municipality for expenditures initially paid from a general fund. See *Bertone, supra* at 549-550. "[R]easonable latitude must be given to the agency in fixing [the amount of] charges," and such charges should "not be scrutinized too curiously even if some incidental revenue were obtained." *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge, supra* at 403, quoting *Opinion of the Justices*, 250 Mass. 591, 602 (1924).

Here, the judge found, in relevant part, that the monies collected from the I/I charge were placed in an account (I/I account), which was separate from the account that held monies collected from ratepayers, called the sewer enterprise fund. She

---

[11]Under the ACO, certain entities were exempt from the sewer bank.

[12]The judge concluded that certain other facts were relevant to whether a particularized service was provided in exchange for the I/I charge, and the developers emphasize them on appeal. They include that no new infrastructure was constructed; that the state of disrepair of the sewer system was not the fault of the developers; and that there were no administrative costs expended by the town. Emphasizing these facts confuses the facts in particular cases with the requirements of *Emerson College*. See, e.g., *Silva* v. *Attleboro*, 454 Mass. 165, 166 (2009) (fees covered costs of municipal employees for administrative duties related to burial permits); *Bertone* v. *Department of Pub. Utils.*, 411 Mass. 536, 545-546 (1992) (electrical system in proper repair, new infrastructure built from fee charged for new hookups).

also found that the I/I charge paid by the developers "reimbursed the [t]own for the monies previously expended by the [t]own to reduce I/I," concluding that "pay[ing] gallon for gallon for the creation of credit for the new flow . . . could be seen as reasonable," but that requiring the developers to pay the ten-to-one ratio was overcompensating the town. In addition, she stated, and the developers agree, that the charge of three dollars per gallon was reasonable because the actual cost of one gallon of remediation was higher. See note 5, *supra.*

The judge also discussed that, at some point, the town transferred some $440,000 from the I/I account into the sewer enterprise fund and, of that, $100,000 was spent on a new pump at one of the town's pumping stations. This expenditure did not result in any I/I being credited to the sewer bank, but the new pump allowed the station to handle I/I that flowed from elsewhere in the system, thereby reducing the necessity of discharging SSO into the river. However, the judge concluded that the $100,000 payment supported her conclusion that the I/I charge was a tax, stating that, as a percentage of the $440,000 the developers paid, $100,000 was a "substantial" amount diverted for general sewer repair, as opposed to direct I/I remediation. She concluded, "[W]hile the funds exacted from [the developers] have generally been put to the purpose of I/I reduction, the reality is that any repair to the dilapidated Saugus system could be so characterized. I am satisfied that the [t]own has already used the I/I [charge] as a source of funding for more general sewer repair."

The developers contend that the judge was correct to conclude that it was unreasonable for them to pay for the removal of ten gallons of I/I for each gallon of new flow they introduced, and that they should have paid only for what they introduced into the system. They also argue that if immediate access to the sewer bank was the particularized benefit, only costs incurred to allow that access, such as administrative costs, would be relevant.

We are not persuaded because, as discussed above, these arguments minimize the importance of the ACO. Pursuant to the terms of the sewer bank set forth in the ACO, the town was required to remove, at least initially, ten gallons of I/I for each gallon of new flow. Therefore, the town's requirement that the

developers comply with that ten-to-one ratio was inherently reasonable. It also was reasonable for the developers to shoulder the entire financial burden involved in their adding new flow to an overburdened system before it was fully repaired, in exchange for immediate access to the sewer system.

The developers also claim that the judge was correct to conclude that, because the $100,000 spent on the new pump did not result in a certain number of gallons of I/I being credited to the sewer bank, the I/I charge was a tax. We do not agree.

As discussed, the judge concluded that the I/I charge was used to reimburse the town for some of the monies it already had spent to remove I/I, so that the sewer bank could become operational. Because she determined that what the developers were paying for was not immediate access to the sewer system but gallons of credit to the sewer bank, she analyzed whether the expenditure provided any direct I/I removal. This was error. We conclude that the analysis of where the monies in the I/I account were spent should have ended when the judge found that the developers reimbursed the town for some of the monies already spent on I/I removal. See *Emerson College, supra* at 425 (valid fee where monies "compensate the governmental entity providing the services for its expenses").

Moreover, although the $100,000 was arguably "substantial" when compared to a total of $440,000 the developers paid, it was incidental when compared to the $6.5 million the town paid to remove enough I/I to allow the developers access to the sewer system by means of the sewer bank. In addition, the developers do not claim that they were denied access to the sewer system as a result of the installation of a new pump or that the new pump failed to help the pumping station handle I/I flow that originated elsewhere in the system.

Finally, the developers argue that, in any event, the town should have reduced the ratio of the number of gallons of I/I they had to pay to remove from ten to six gallons (and then to four) sooner than it did, pointing out that the issue whether the town should reduce the number of gallons of I/I removed was voted down by the board of selectmen, serving as sewer commissioners, several times. Although there was testimony that the commissioners did vote down reducing the ratio, no dates or

minutes of these meetings are in the record.[13] In addition, the judge made no explicit findings concerning whether the ratios should have been reduced sooner. She stated only that the town achieved the reduction of 250,000 gallons of I/I removal "in approximately August of 2005" and 500,000 gallons in early 2006. The stipulated facts state that the developers paid their I/I charges through 2005 and 2006, before and after the town achieved its milestones under the ACO.[14] The town reduced the ten-to-one ratio to six-to-one on January 30, 2007, and to four-to-one on December 11, 2007.

The town argues that there is evidence that it did not lower its ratio right away because there were "clear difficulties" in estimating the actual amount of I/I removed due to any single repair. Therefore, it argues, given that the financial consequences were so high for violating the ACO, it should not be penalized for erring on the side of providing a "margin of safety." We agree.

Concerning when the town should have reduced its ratio from ten-to-one to six-to-one, we conclude that it should have done so within a reasonable time after it achieved the removal of the first 250,000 gallons of I/I. Therefore, as to the I/I charges paid before "approximately" August of 2005, there can be no question that the amount charged was reasonable. As to the I/I charges paid on October 4 and November 9, 2005, see note 14, *supra*, the developers have not demonstrated that the town's delay in reducing the ratio, at least through the end of 2005, was not "reasonably designed to compensate [the town] for anticipated expenses," because the town had achieved only the minimum results required to utilize the sewer bank. *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass.

[13]The developers focus only on the deposition testimony of the town manager, who stated that the reason the sewer commissioners voted against a reduction in the ratio was to save taxpayers money, but the judge did not explicitly credit the testimony. There is deposition testimony of two members of the sewer commission, who testified to other reasons that they voted against a reduction in the ratio, see note 17, *infra*.

[14]Denver Street LLC paid on October 4, 2005; Oak Point Realty Trust paid on November 9, 2005; and Central Street Saugus Realty, LLC, paid "on various dates" from May, 2005, through December, 2006. There was no evidence when Vinegar Hill Estates Trust paid its I/I charge, but it is uncontested that this trust benefited from reduced ratios.

395, 404 (1985). We conclude that it was rational for the town to require removal of ten gallons for every gallon of new flow the developers introduced, so that the new flow did not create a situation where the town was falling below the initial 250,000 gallons of I/I established by the ACO.

The question remaining is whether the developers have demonstrated that it was reasonable for the town to wait approximately eighteen months after the removal of 250,000 gallons of I/I to reduce the ratio to six-to-one, and approximately eighteen months after the removal of 500,000 gallons of I/I to reduce the ratio to four-to-one.

The facts that inform our analysis on this question are as follows. The three dollars per gallon charge was only a standard industry estimate of the costs of removing the I/I. The costs could not be "figure[d] . . . with any degree of accuracy," and depending on calculations not relevant here, the department would accept a figure as high as thirteen to fourteen dollars per gallon. Thus, as the judge found, the developers were not paying the true cost of removing each gallon of I/I, even if one accepts the lowest estimate of the actual cost of four dollars to four dollars and fifty cents. In addition, according to the testimony of the professional engineer[15] whose testimony the judge credited, one of the problems with estimating the number of gallons of I/I that was removed with each repair was due to groundwater migration. That is, when certain known leaks or defects were repaired in a pipe, I/I would travel further down the system where defects had not been evident in an initial inspection, and cause I/I overflow that also had to be repaired. He testified that, accordingly, the town may have thought it removed one hundred gallons of I/I but eighty gallons would come back in a pipe one to two years later. He further stated that this groundwater migration was not part of the number of gallons of I/I the town estimated was removed from each repair. The engineer testified that, in his opinion, the ten-to-one ratio had a built-in safety factor because, after having been fined already, "the last thing the town would want" was another SSO event. Moreover, from the time the ACO was signed until the time of trial, there were

---

[15]The town had hired the engineer's firm to assist, in part, in estimating the amount of I/I removal consistent with the ACO.

instances where the town and the department disagreed over the number of gallons of I/I that had been removed, with the department always prevailing; the result was that the town was informed that it had not removed the number of gallons of I/I that it reported that it had.[16] For example, according to the town manager, thousands of gallons of I/I allegedly removed between April and August, 2005, were disputed by the department and, by the time of the deposition in September, 2006, that dispute had yet to be resolved.[17]

Given these facts, as well as the financial consequences the town could suffer if it failed to meet its obligations under the ACO, the developers have not demonstrated that it was unreasonable for the town to postpone reducing its ratios for approximately eighteen months, rather than risk violating the ACO. If the developers thought that the ratio of ten-to-one was too burdensome, they could have waited until the ratio was reduced before connecting their properties.

*Conclusion.* For the reasons set forth above, the judgments for the plaintiff developers are vacated. Judgments shall enter for the town in each of the four cases.

*So ordered.*

---

[16]This may account for the testimony at the December, 2008, trial that, at that time, the town had removed approximately 450,000 gallons of I/I, yet the judge found that 500,000 gallons of I/I had been removed in early 2006.

[17]One member of the sewer commission also addressed the department's disagreement with the town's estimate of the number of gallons of I/I that had been removed in 2005 and 2006. In addition, he stated that he voted against lowering the ratio in 2005 and 2006 because, as repairs were being done, the estimate of the number of gallons of I/I in the sewer system went from approximately four to six million gallons to ten to fourteen million gallons. Therefore, removing 500,000 gallons meant that only five per cent of I/I had been removed when the town thought that ten per cent would have been removed, and he was concerned about the actual cost of the I/I removal. A second member of the sewer commission reiterated the decertification of gallons of I/I by the department in 2005, and stated that he voted against reducing the ratio because of "concerns about the gallonage, what the scope of the problem is; was the problem larger than we believed or how much it was going to cost to get it done and some [other members] wanted to see the gallonage larger before we made such a reduction."