Wilkins, Douglas H., J.
This is a declaratory judgment action brought under G.L.c. 231Aby the Blackstone Smithfield Corporation (“BSC”), which asserts that the Town of Blackstone (‘Town”) has an obligation to provide water service to BSC’s property at the so-called Blackstone Mill in North Smithfield, Rhode Island, at the rates prevailing in Woonsocket, Rhode Island (“Woonsocket rate”). In a Memorandum of Decision and Order on Plaintiffs Motion for Partial Summary Judgment and Defendant’s Cross Motion for Summary Judgment (“Summary Judgment Decision”), the Court previously held, among other things, that “judgment shall enter for the plaintiff declaring that: (1) the benefit and burden of continued access to water from the water-supply system runs with the parties’ respective parcels; and (2) the Town is obligated to continue supplying the necessary water at a reasonable rate.”
The only task remaining for resolution at trial was to determine “a reasonable rate.” The Court held a one-day bench trial on October 29, 2012 at which two witnesses testified. The parties introduced 11 exhibits.
*574 FINDINGS
The Court incorporates the facts determined by the Summary Judgment Decision and finds the following additional facts by a preponderance of the evidence at trial.
The property at issue (“Property”) consists primarily of a large mill building, which has been converted to residential condominiums and light manufacturing units. Until 1934, Lonsdale Corporation (“Lonsdale”) owned both the Property and the water system that provides water to the Property. Lonsdale sold the water system to a private company, the Blackstone Water Company (“Water Company”) by deed dated November 27, 1934, recorded on November 30, 1934 in Book 2627, Page 571 of the Worcester County Registry of Deeds. On November 27, 1934, Lonsdale and the Water Company also signed an Agreement (“Agreement”) , which stated that it “shall be binding upon and shall inure to the benefit of their respective successors and assigns.”
The Agreement included the following provision:-
c. Upon request of the LONDSDALE COMPANY, the WATER COMPANY will sell and deliver water from said system to LONSDALE COMPANY, for use in its several properties, whether located in Blackstone or North Smithfield, which are located within the area served by said system, at the same rates and upon the same conditions as those established for all its customers . . . except that as to water sold and delivered to LONSDALE COMPANY for use at its Blackstone Mill (which is a consumer of water in wholesale quantities) the WATER COMPANY will charge LONSDALE COMPANY therefore at the same rates as those which may be charged from time to time said City of Woonsocket.
Paragraph d of the Agreement stated that the purchase price was inadequate without paragraph c, which “constitute [d] a vital and valuable portion of the consideration.” The Agreement was recorded nearly 20 years later, on February 26, 1954 in Book 3570, Page 337.
BSC is the successor to Lonsdale. The Town is the successor in interest to the Water Company. The Town purchased the water system by deed from the Water Company dated February 23, 1954 for a stated consideration “of the sum of Ten Dollars ($10) and other considerations to it paid by INHABITANTS OF THE TOWN OF BLACKSTONE.” That deed did not refer to the Agreement (which was recorded 3 days later). There is no evidence that the Town was on notice of the Agreement when it acquired the water system. The Town’s deed was recorded on June 8, 1954. The Town provided water to the Property for decades.
On August 4, 2004, the Town’s Water and Sewer Commission adopted a new policy, imposing a $3,000 per unit fee (“Connection Fee”) for connecting each unit in a multi-family dwelling to its water system. The policy read, in part:
Effective immediately, each water connection to each dwelling unit in any multi-family building will be assessed a $3,000.00 fee per unit for the connection. Each water connection to be installed by the developer and approved by the Water and Sewer Commission for each unit in a multi-family dwelling shall be subject to a $3,000 fee per branch connection per unit.
This policy shall take effect immediately and shall apply to all permits issued from this date.
BSC disputes its obligation to pay the Connection Fee.
Section 10 of the Town’s Water and Sewer Regulations, quoted below, requires separate metering of each unit held in separate ownership within a single structure, such as a condominium, with certain exceptions (also quoted below).
The Water Commissioners negotiated an agreement with BSC for the Town to “continue to sell water to [BSC] at a $3,000 per Resident rate times 120 units for a total cost of $360,000, and recommended approval by the Board of Selectmen. Pursuant to Blackstone General Bylaw §189-11, the Board of Selectmen has the authority to enter into agreements with entities outside the Town to sell or give water from the Town’s public water supply.”
DISCUSSION
The Court does not revisit the Summary Judgment Decision, which held that the Town’s obligations arise as a matter of property law, under the law of Servitudes, but not under the Agreement. Based upon the evidence and arguments presented at trial, the Court draws the following additional conclusions.
There is no question that the Town’s water commissioners have broad authority to manage and control their public water supply system “in such manner as they shall deem for the best interests of the town.” G.L.c. 40, §39E. They have authority to “regulate the use of the water and fix and collect just and equitable prices and rates for the use thereof.” G.L.c. 41, §69B. No statute purports to give them authority to violate existing contractual obligations duly incurred.
BSC first argues that the Town must apply the water rate imposed by the City of Woonsocket, Rhode Island under the Agreement. The Agreement is not ambiguous. The Water Company, as purchaser of the water supply system, was obliged to charge the “same rates as those which may be charged from time to time” in the City of Woonsocket, Rhode Island.[1] The Town cites no case suggesting that honoring the Agreement would result in violation of the “just and equitable” standard of G.L.c. 41, §69B or that the statute confers the authority to “take” BSC’s rights under the contract. Certainly, the Woonsocket rate is one reasonable rate, which the Town may charge, should it choose.
*575 The Town is not limited to the Woonsocket rate, however, because it lacked notice of the Agreement when it purchased the water supply system. The Summary Judgment Decision did not rest on the Agreement, but concluded that a servitude existed due to the evident conditions on the ground and of record. Just as there was no evidence that the Town had timely notice of the Agreement at the summary judgment stage (see Summary Judgment Decision, pp. 8, 9), there was no credible proof at trial that the Town had actual knowledge of the Agreement itself or the terms of the Agreement, when it accepted the deed to the water system. BSC argues that the Town was on notice of the Agreement before the deed from the Water Company was recorded, but that is not the issue; by that time, the Town, as a bona fide purchaser for value, had already acquired the water system free of any unrecorded restriction. See Hanson v. Lindsay, 444 Mass. 502, 509-10 (2005); Flynt v. Arnold, 43 Mass. (2 Mete.) 619, 626 (1841) (unrecorded deed is good as between the parties and protected from later-recorded encumbrances). Cf. also G.L.c. 184, §25 (invalidating indefinite references to “encumbrances or other interests not created by instruments recorded in due course”).[2]
The implied servitude found by the Summary Judgment Decision (see p. 9) does not support BSC’s claim that the Woonsocket rate applies. That servitude arose from the Town’s knowledge of the nature of the water system that the Town acquired and the relationship of the pipes, mains, connections and appurtenances to the Property. Nothing in the nature of the water system itself or the facts reasonably ascertainable regarding the assets acquired by the Town would place a purchaser on notice that the Town would be bound by the Woonsocket rate, as opposed to its own duly adopted rules, regulations and rates made pursuant to statutory authority. There was nothing at the Registry to alert the Town to such an obligation.
It would be inequitable to hold the Town to a bargain it never made, when the seller and its predecessor failed to record the Agreement or otherwise inform the Town about the Woonsocket rate obligation. The Court therefore rejects the Woonsocket rate as binding upon the Town, over its objection. The natural implication of the facts known to the Town at the time of purchase is that any obligation to provide water also conferred the right to impose charges pursuant to generally-applicable rules, which include the Town’s regulations and policies.[3] The Town therefore may charge BSC for water under its own Water and Sewer Regulations, including its own policies.
BSC next contends that the Town’s connection fee is inapplicable by its terms at this time. The Court agrees. The 2004 Water and Sewer Regulation requiring a connection fee states that it “shall apply to all permits issued from this date.” The Town has not issued a water permit for the Property since that date. Indeed, there is no evidence that the Town has provided any new connection, equipment, services or other consideration beyond sale and delivery of water. Because the Town’s regulations specifically require a new connection and a “permití] issued” after the 2004 effective date of the Water and Sewer Regulations, BSC is not required to pay a Connection Fee at least until a permit is issued.
The Court does not, however, adopt BSC’s alternative rationale under the regulations, namely that the Superintendent of Public Works has made a determination that would exempt the Blackstone Mill from a per unit connection fee. Article 10 of the Blackstone Water and Sewer Regulations provides, in relevant part, that:
Where portions of a single structure are held in separate ownership, such as through condominium ownership, each separately owned portion shall be separately metered and served by public water, unless either such service is not provided to the premises, or the Superintendent of Public Works approves ajoint service upon determination that the service facilities are assured to be adequate for any anticipated demand, and that secure arrangements have been made for equitable assessment and collection of all water charges. [Emphasis added.]
BSC has not proven the necessary facts to trigger application of the exception set forth in the bold portion of the regulation just quoted.
It is true that the Town’s Superintendent required BSC to install a meter by which all water to the Property would be measured and that he planned for BSC to be charged on the basis of that meter for all water supplied by the Town. There is, however, no credible evidence of a “determination” under the regulation. Nor is there a showing that the Superintendent found that the service facilities would be “adequate for any anticipated demand.” Most importantly, the Superintendent did not determine “that secure arrangements have been made for equitable assessment and collection of all water charges.” On the contrary, the Town has significant and well-founded concerns that multiple ownership, in the form of the condominium, has the potential to lead to problems if substantial numbers of unit owners fail to pay BSC or its successor for water, or if BSC (or a condominium association) has difficulty paying for water when the unit owners fail to pay it. The Superintendent did not find that those concerns have been met through “secure arrangements.”
The inapplicability of the exception may imply that BSC must install separate meters for each unit. Decision on that question would be premature, however. The Town has not formally attempted to impose that requirement on BSC, which has not had an opportunity to exhaust its remedies within Town government. Resolution of the question at the local level may involve exploration of what arrangements can be made for *576 equitable assessment and collection of water charges from individual unit owners in the absence of separate meters. The parties do not squarely ask the Court to decide the separate metering question (although it lurks in the arguments that turn upon the need for a permit, which presumably would be required for a separate meter). There is no “actual controversy” within the meaning of G.L.c. 231A at this time on the question whether BSC must install separate meters for “each separately owned portion” of Blackstone Mill.
It is also not necessary to reach the question of whether the Connection Fee would be a tax, instead of a fee. However, because there may be an appeal, the Court addresses the issue by making an initial ruling at the trial court level and, more importantly, by finding the relevant facts.
The tax versus fee issues in this case arises in an unusual context. The Town has not attempted to exercise its taxing power. At present, it does not even voluntarily exercise its proprietary authority to sell water to BSC. Because of the dispute over the Connection Fee, the Town has attempted to stop delivering water to BSC. The Town’s obligation to provide water over its objection arises out of a purely private transaction in 1934, with attendant property law obligations and rights created by the Town’s predecessor and not by governmental authority. The price, set by private contract and enforced against an unwilling Town, is neither a municipal fee nor a tax in the ordinary sense. Cf. Denver Street, LLC v. Town of Saugus, 462 Mass. 651, 652 (2012) (discussing municipal power “to levy, assess, or collect a tax”), quoting Silva v. Attleboro, 454 Mass. 165, 168 (2009). The Court does not believe, as a matter of law, that a purchase price created and imposed by a private party upon a predecessor in title to a Town in the circumstances of this case could be invalidated on the ground that it constitutes a tax.[4]
In any event, this Court’s principal role is not to resolve a legal issue that may affect the outcome, if at all, only on appeal. Its duty is to find the facts in the event of such an appeal.
The price is not a regulatory fee, but, if it is a “fee” at all, then it is a user fee based on the Town’s rights “as proprietor of’ the water used. See Denver Street, 462 Mass. at 652, quoting Emerson College v. Boston, 391 Mass. 415, 424 (1984). The question is “whether the limited group is receiving a benefit that is, in fact, sufficiently specific and special to its members.” Id., 462 Mass. at 660.
BSC receives a particularized benefit by receiving water, delivered out of state, from the Town, which has no statutory or regulatory obligation to provide it. It receives no other particularized benefit. It has not received a new permit; has not increased its flow; does not require additional administrative or other costs due to metering of each residence (as there is only one meter, for which BSC is responsible); benefits from no infrastructure improvements; and imposes no additional costs on the Town by reason of the conversion to a multi-unit residential structure. If Denver Street analysis applies, BSC has therefore received no specific and special benefit within the meaning of that case — unless that concept includes the voluntary provision of water when the Town was under no statutory or regulatory right to provide it.
As to the other Denver Street factors, it is beyond dispute that BSC has voluntarily decided to obtain water, thereby meeting the second factor. On the third factor, the Court finds that the Connection Fee is not designed to compensate the town for its expenses rather than to raise revenue. The condominium conversion has created no new expenses for the Town so far.
Finally, this case involves implementation of the implied servitude in circumstances substantially consistent with those originally contemplated by the parties in 1943 as evident from the facts ascertainable on the ground and at the Registry prior to the Town’s purchase, notwithstanding the Town’s current operation of the water system as a public water supply. Nothing in this decision or the judgment of the court shall be taken as addressing the many possible facts not presently before the court, such as future increases in water use beyond those covered by the Agreement, separate metering of individual condominium units resulting in retail rather than wholesale delivery of water, default in payment, allocations during water shortages, expiration of the servitude (if and to the extent that it constitutes or contains a “restriction”) pursuant to statutes such as G.L.c. 184, §28 (and §27(b){2)), or assertion by the Legislature of police power or other legislative efforts to address this or similar situations. Nor does this decision address the potential concern that the Town reasonably raises, in the event that the single water meter to Blackstone Mill stays in place and BSC fails to pay the water bill in full (for instance if one or more unit owners fails to pay their bills or BSC (or its successor) runs into financial problems), arguably placing every unit owner and business at risk by leaving the Town to invoke the only remedy it might have, namely shutting off all water to everyone at the Properly for breach of a servitude that applies to the Property as a whole.
CONCLUSION
Final Judgment shall enter incorporating all provisions of “Order” included within the Summary Judgment Decision, dated May 8, 2009, along with the following additional provisions:
For purposes of determining a ‘reasonable rate’ within the meaning of clause (2) of the Summary Judgment Order, the Town may employ its own generally applicable rates or the rate applicable in Woonsocket, Rhode Island but may not impose a connection fee under present circumstances. The Court finds no actual controversy regarding any *577 obligation to install separate meters at the Blackstone Mill or any future circumstances that may warrant a connection fee under the Town’s regulations.

 The Agreement is limited to sale and delivery. Even under the Agreement, charges for matters beyond sale and delivery may well be appropriate under the Town’s statutory authority-

 If an indefinite deed reference to such matters is ineffective, then a fortiori, the absence of such a reference cannot give effect to such unrecorded matters.
BSC asserts (Trial Memo at 4) that “until a deed is recorded, legal title is not vested.” The cases cited for that proposition, however, only stand for the principle that existing encumbrances in the chain of title are not extinguished by failure to mention them in the deed. See Cheever v. Graves, 43 Mass.App.Ct. 601 (1992); Melville Shoe Corp v. Kozminsky, 268 Mass. 172, 179 (1929). See Dubinsky v. Cama, 261 Mass. 47, 56 (1927). In this case, the Agreement is not in the chain of title because it was never recorded before the Town purchased the water system. BSC cites no case in which a bona fide purchaser without notice of an encumbrance later became bound by a subsequently recorded encumbrance. Such a rule would defeat the “notice” principles embodied in the recording statute. See Flynt v. Arnold, 43 Mass. (2 Metc.) 619, 626 (1841) (cited by BSC).

 The basic concept of generally applicable rates appears in the Agreement. The reasonable implication of the facts known to the Town is that protection against unreasonable pricing depended upon the general applicable of the rates charged. Choice of the rates applicable in Woonsocket was not the only way to do this, however.

 To suggest that a voluntary purchase and sale of a town asset (water) may be attacked on the basis of the price being a tax rather than a fee would be akin to challenging a Town’s unwillingness to sell real estate or surplus property for a price that the prospective purchaser believed was unrelated to the Town’s costs. The situation in this case is even more egregious, involving a private lawsuit to compel provision of water under a privately-created arrangement. The law does not go that far.